IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 24, 2021

## STATE OF TENNESSEE v. QUINDARIUS LAMONTA JORDAN

**Appeal from the Criminal Court for Davidson County**
**No. 2018-A-383      Jennifer Smith, Judge**

_____

### No. M2020-00714-CCA-R3-CD

_____

The Defendant, Quindarius Lamonta Jordan, pleaded guilty in the Davidson County Criminal Court to attempted second degree murder, a Class B felony, aggravated assault, a Class C felony, and unlawful possession of a firearm, a Class A misdemeanor *See* T.C.A. §§ 39-13-210 (2018) (second degree murder); 39-12-101 (2018) (criminal attempt); 39-13-102 (2018) (aggravated assault); 39-17-1307 (2018) (unlawful weapon possession). The trial court imposed eleven years for attempted second degree murder, five years for aggravated assault, and eleven months, twenty-nine days for the firearm violation. The court imposed partial consecutive service, for an effective sixteen-year sentence. On appeal, the Defendant contends that the trial court erred by ordering confinement and consecutive service. Although we affirm the judgments of the trial court, we remand the case for the entry of judgment forms reflecting a dismissal of the charges in indictment Counts 1, 4, 5, and 6.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Jeffrey A. DeVasher (on appeal), District Public Defender; and Tanner Gibson and Jon Wing (at sentencing), Assistant District Public Defenders, for the appellant, Quindarius Lamonta Jordan.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Glenn R. Funk, District Attorney General; Doug Thurman, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to a shooting incident on October 5, 2017. The grand jury returned a seven-count indictment charging the Defendant with three counts of attempted first degree murder, reckless aggravated assault, reckless endangerment, employing a firearm during the commission of a dangerous felony, and unlawful possession of a firearm with the intent to go armed.[1] Pursuant to a plea agreement, the Defendant pleaded guilty to the attempted second degree murder of Brian Love, aggravated assault of Marilyn Jenkins, and misdemeanor unlawful possession of a firearm. One count each of attempted first degree murder, reckless aggravated assault, reckless endangerment, and employing a firearm during the commission of a dangerous felony were dismissed pursuant to the plea agreement. The trial court would determine the length and the manner of service of the sentences.

At the guilty plea hearing, the State's recitation of the facts was as follows:

> . . . [H]ad this matter proceeded to trial, the State expects that the facts would . . . show that on October 5th of 2017, at around 2:50 p.m., Mr. Quindarius Jordan fired four shots while standing in an alleyway of Litton Avenue between Gallatin Road and Davis Street. Mr. Jordan was aiming in the direction of Brian Love. . . . [W]hile the shots were being fired, one of the shots hit a bystander, Ms. Marilyn Jenkins, who was waiting in the parking lot . . . . She was struck in the hip with the bullet, which remains lodged in her body. Witnesses called the police and a show-up was conducted that identified Mr. Quindarius Jordan as the shooter. . . . Mr. Quindarius Jordan was subsequently stopped by officers near the scene, and a handgun -- a .32 caliber handgun was recovered from that vehicle. That handgun was subsequently tested, and a DNA match came back to Mr. Jordan. A show-up was conducted, and two of the witnesses identified Mr. Jordan as the individual who had fired the shots. All these facts occurred here in Davidson County -- Mr. Jordan does not have a handgun permit, and therefore was prohibited from possessing a handgun at this time.

At the December 6, 2019 sentencing hearing, the presentence report was received as an exhibit and showed that the twenty-year-old Defendant did not have previous criminal convictions. However, the Defendant had juvenile delinquency adjudications between March 2011 and May 2016. In March 2011, a petition for delinquency was filed alleging that the Defendant had committed aggravated assault involving a knife and disorderly conduct. In May 2011, a petition for delinquency was filed alleging that the Defendant had

---

[1] The indictment included an eighth count charging the Defendant's brother with being an accessory after the fact. *See* T.C.A. § 39-11-411 (2018).

committed disorderly conduct, and the Defendant received pretrial diversion for the aggravated assault and two counts of disorderly conduct. The petitions for delinquency were ultimately dismissed in August 2011. In October 2011, the Defendant was found delinquent for two counts of assault involving the fear of bodily injury. The presentence report reflects probation violations on June 27, 2012, and on April 5, 2012. In May 2016, the Defendant was found delinquent for assault involving bodily injury and for failure to appear in connection with the assault.

The presentence report reflects that the Defendant completed the tenth grade before dropping out of school. He reported having good physical and mental health but stated he had been hospitalized previously at a behavioral health facility for two to three weeks. He reported that he had been prescribed Seroquel but that he had stopped taking the medication as prescribed. The Defendant reported also receiving treatment at "Centerstone" as a juvenile. The Defendant reported first using marijuana at age nine and using it when it was available thereafter. The Defendant reported first drinking alcohol at age thirteen or fourteen and last drinking alcohol at age eighteen. The Defendant reported living with his mother and five siblings before being removed from the family home and placed in State custody from ages twelve to eighteen. The Defendant reported having a one-year-old son. The Defendant reported employment between May and September 2017 but was fired because he came to work smelling of marijuana. The Strong-R Assessment stated that the Defendant had a score of "high for violence."

Marilyn Jenkins testified that on the day of the shooting, she walked across Litton Avenue, sat on a rock, and waited on her "ride." She said that "some boys jumped from behind that limo place with guns" and that the next thing she knew, she had been shot. She said that two bullets remained lodged in her leg, that they could not be removed because the risk of paralysis and death was too high, and that she would have to "deal with it" for the rest of her life. She said that she remained under a physician's care and that she was prescribed "all kind[s]" of pain medication for constant pain. She walked with a cane since the shooting.

Ms. Jenkins testified that the Defendant was about eight to nine feet from her at the time of the shooting. She recalled that the shooting occurred during the early afternoon daylight hours. She said that she was happy and went places before the shooting but that since the shooting, she was scared and did not do things anymore. She said that it was difficult to get around physically and that loud noises caused her distress. She said that she now relied on her daughter for assistance and believed that she suffered from depression and post-traumatic stress disorder, although she had not sought mental health treatment.

Melissa Knapp, a literary coach at an elementary school, testified for the defense as a character witness. She recalled that the Defendant had been hardworking and had not caused disciplinary issues from first through fourth grade.

The Defendant testified that he was age eighteen at the time of the shooting. He said that he had been in pretrial confinement for more than two years and that he had not been in confinement this long previously. He said that his arrest in this case was his first since becoming an adult. He described his confinement as "drama," "losing hope," and "not knowing what to do." He said that his confinement had helped him decide his child was the most important person in his life.

The Defendant testified that he was responsible for shooting Ms. Jenkins, although he intended to shoot John Holden. He agreed his conduct "grievously" harmed Ms. Jenkins. The Defendant denied intending to shoot Mr. Holden, whom he knew from previous altercations, when the Defendant left home on the morning of the shooting. The Defendant said Mr. Holden and Brian Love were friends. The Defendant agreed an ongoing feud existed between the three men and said the feud stemmed from a robbery. When discussing the robbery, the Defendant said that he and his friend attempted to sell "him" a gun and that "they ended up robbing us." The Defendant said a "back-and-forth" began and that he had shot "him" in the leg on August 25. The Defendant agreed that "he" had shot at the Defendant previously, as well. The Defendant denied being a gang member.

The Defendant testified that Mr. Holden and Mr. Love were incarcerated at the time of the sentencing hearing and that he did not intend to associate with them if he received probation.

The Defendant testified that in July 2017, he obtained the firearm from Marcus Summers, who was with the Defendant on the day of the shooting. He agreed he had the firearm for several months before the shooting. When asked how he felt about Ms. Jenkins's injuries, the Defendant said that he was disappointed in himself and apologized to her. He denied intending to hurt Ms. Jenkins and said he hoped her medical condition improved. He said that his conduct was "dead wrong."

The Defendant testified that his son was born during his two-year pretrial confinement, that he wished he could be there for his son, and that he wanted to "be a man" and learn from his mistakes. He said that he lived with his mother and five siblings before he entered foster care in June 2012 at age thirteen. He said his mother, ultimately, relinquished her parental rights. He described his childhood as "hopeless" and said that his mother "had nothing" and that he and his siblings "needed things [they] could never get." He recalled that they moved frequently, staying in motels. He said that his mother had not visited during his pretrial confinement. He said that he barely knew his father, whom he believed was in prison. The Defendant said he first met his father at age fifteen.

The Defendant admitted that had been adjudicated delinquent for assaults, some of which involved his brothers and classmates. He agreed he frequented the juvenile court system and said he had been angry because he had nobody to rely upon as a child. He said

that he now had someone for whom to live, that he wanted to raise his son, and that his son's mother was at the hearing. He said that he had known her since he was age twelve or thirteen and that they had been involved in a serious romantic relationship for more than three years. He said that if he received probation, he would live with his son and his son's mother and that living outside of east Nashville would be beneficial. He said that his son's mother had two jobs and that he wanted to help raise their child.

The Defendant testified that if he received probation, he would work at a warehouse with his son's mother. He said that he completed the tenth grade but left because he went "on the run and drying out in DCS." He said that he was responsible for each of his previous bad decisions. He said he wanted to earn his GED and obtain his driver's license. He said his son's mother would drive him to probation meetings until he obtained his driver's license.

On cross-examination, the Defendant testified that in March 2011, he received pretrial diversion for aggravated assault with a deadly weapon and that he struck someone with a bat. He said that he was adjudicated delinquent in a second aggravated assault in October 2011 and that the incident involved fighting. The Defendant recalled being on probation in juvenile court and did not dispute he violated the conditions of his release twice. He denied using drugs and said the probation violations probably involved his not being at home. He did not recall his arrests for evading arrest and trespass but said that he was arrested for aggravated robbery and aggravated burglary in 2014, that he robbed someone downtown, and that "we broke into a house." He admitted stealing a television and game console from the home and said the owners were not home at the time. He admitted that he committed aggravated robbery with the use of a handgun in October 2014 and that he took the victims' money. He said that in 2014, he smoked marijuana. He did not dispute that in 2014, he was involved in a fight, which resulted in what would have been a misdemeanor if he had been adult. He agreed he was found delinquent for assault in November 2015 and that fighting was involved. Although he did not recall the details, he did not dispute he was found delinquent for failing to appear in 2015.

The Defendant testified that although he did not intend to kill anyone during the shooting in the present case, he admitted he fired the handgun at Mr. Love and Mr. Holden. He said that he was sorry for harming Ms. Jenkins and for "[f]iring a gun, period."

On redirect examination, the Defendant testified relative to the October 2011 aggravated assault that he and his brother fought at a motel, that he had a knife, that his brother hit him with a bottle, and that he never stabbed his brother. Regarding the March 2011 incident, he did not dispute that he and his mother argued, that he ran away from the motel, and that she called the police. The Defendant said he would work on his anger. He agreed that his running away from foster care resulted in probation violations in juvenile

court. He said that the aggravated robberies addressed by the prosecutor involved a group of people that included adults and other juveniles.

The Defendant submitted without objection a report from The Education Rights Project detailing the Defendant's educational and social services histories. The court agreed to consider the report, but the report is not contained in the appellate record. The court took sentencing under advisement.

On April 16, 2020, the trial court entered an order denying the Defendant's request for alternative sentencing and imposing an effective sentence of eighteen years, eleven months, and twenty-nine days' confinement after considering the evidence at the guilty plea and sentencing hearings, the presentence report, the nature and circumstances of the offenses, the mitigating and enhancement factors, the Defendant's testimony, and the Defendant's potential for rehabilitation.

Relative to mitigation evidence, the trial court applied factor (13) because the Defendant pleaded guilty to the charges, expressed remorse for his conduct, and was "a victim of neglectful parents." *See* T.C.A. § 40-35-113(13) (2019) ("Any other factor consistent with the purposes of this chapter."). The court placed some weight on this evidence. However, the court declined to apply factor (6). *See id.* § 40-35-113(6) ("The defendant, because of youth or old age, lacked substantial judgment in committing the offense[.]"). The court found, based upon the Defendant's testimony, that he knew his conduct was wrong at the time of the offenses. The court found that the Defendant had not availed himself of opportunities for rehabilitation. The court, likewise, declined to place any blame on the Department of Children's Services and the school system for the Defendant's conduct.

The trial court applied enhancement factors (1), (6), (8), (9), and (10). *See id.* § 40-35-114 (2019). The court found that the Defendant had a lengthy juvenile record of criminal behavior, including violent offenses. *See id.* § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court found that the personal injuries suffered by Ms. Jenkins were particularly great. *See id.* § 40-35-114(6) ("The personal injuries inflicted upon . . . the victim [were] particularly great[.]"). The court found that she had two bullets lodged inside her body, that she suffered constant pain, that she required the use of a cane since the shooting, and that she might suffer from post-traumatic stress disorder and depression. The court placed great weight on this factor. The court applied factor (8) because the Defendant had been adjudicated delinquent for violating the terms of his probation on April 5, 2012, and June 27, 2012. *See id.* § 40-35-114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]").

-6-

Likewise, the trial court applied enhancement factor (9) to the attempted second degree murder and aggravated assault convictions because the Defendant used a firearm during the commission of the offenses. *See id.* § 40-35-114(9) ("The defendant possessed or employed a firearm . . . during the commission of the offense[.]"). The court applied factor (10), as well, because the Defendant fired his weapon four times during the daylight hours. *See id.* § 40-35-114(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high[.]"). The court found that the Defendant's conduct endangered his intended victims and innocent bystanders. The court placed great weight on this factor. The court, likewise, determined that the enhancement factors outweighed the mitigation evidence.

The trial court determined, with regard to consecutive service, that the Defendant was an offender whose record of criminal activity was extensive based upon the presentence report and the evidence presented at the sentencing hearing. *See id.* § 40-35-115(b)(2) (2018). Although the court considered the nature of the Defendant's criminal conduct as a juvenile, the court found that the Defendant's behavior included three assaults involving bodily injury and/or the use of a deadly weapon. The court likewise determined that the Defendant was a dangerous offender whose behavior indicated little to no regard for human life and that he had no hesitation about committing a crime in which the risk to human life was high. *See id.* § 40-35-115(b)(4). The court relied upon the facts of the present offenses and focused on the Defendant's use of a firearm during the day in a public location, his firing multiple shots at multiple intended victims, and his juvenile record, which included offenses involving the use of a firearm. The court determined based upon the circumstances of the offenses that the Defendant's conduct was aggravated, posing a risk to the public even beyond his intended victims, and evidenced little or no regard for human life. *See id.* § 40-35-115(b)(4). The court found that consecutive service reasonably related to the severity of the offenses and was necessary to protect the public from the Defendant's further criminal behavior.

The trial court sentenced the Defendant as a Range I, standard offender and imposed twelve years for the attempted second degree murder conviction, six years for the aggravated assault conviction, and eleven months, twenty-nine days for the firearm violation. The court imposed consecutive service, for an effective sentence of eighteen years, eleven months, and twenty-nine days.

However, on April 23, 2020, the Defendant filed a motion for a reduction of his sentence pursuant to Tennessee Criminal Procedure Rule 35. On June 10, 2020, the trial court entered an order reducing the Defendant's sentences and modifying its previous order of consecutive service. The court reduced the attempted second degree murder sentence to eleven years and the aggravated assault sentence to five years and ordered consecutive service of only the eleven-year and the five-year sentences, for an effective sixteen-year sentence. The court declined to reconsider its denial of alternative sentencing based upon

the seriousness of the offenses and its previous determinations. Although the court modified its order of consecutive service, the court determined that the circumstances of the offenses were egregious and that consecutive service was related to the severity of the offenses. Amended judgments were entered reflecting the modified sentences. This appeal followed.

The Defendant contends that the trial court erred by ordering the Defendant to serve his entire sentence in confinement. He acknowledges that his eleven-year sentence for attempted second degree murder renders this sentence ineligible for alternative sentencing and requests that this court modify the sentence to ten years, making the sentence eligible for probation. Likewise, the Defendant contends that the trial court erred by relying on his juvenile record in imposing consecutive service, although he acknowledges that his juvenile adjudications can be considered. He asserts that many of his adjudications were the result of fighting with his brother and of his association with adults who were committing criminal offenses and that he is not a dangerous offender.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. §§ 40-35-102 (2018), 41-1-126 (2018) (validated risk and needs assessments)..

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant

sentenced to ten years or less. T.C.A. § 40-35-303(a) (2018). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *Ashby*, 823 S.W.2d at 168; *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2018); *see Trotter*, 201 S.W.3d at 654. A trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. *See State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017) (concluding that the same factors used to determine whether to impose judicial diversion are applicable in determining whether to impose probation); *see also State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

The trial court imposed within-range sentences for each conviction offense. *See* T.C.A § 40-35-111 (imprisonment terms for felonies and misdemeanors). As a result, the court's determinations are afforded a presumption of reasonableness. The record reflects that the court considered the evidence at the guilty plea and sentencing hearings, the presentence report, the principles of sentencing, the nature and circumstances of the offenses, the mitigating and enhancement factors, the Defendant's testimony, and the Defendant's potential for rehabilitation. Although the court applied one mitigating factor because the Defendant pleaded guilty, expressed remorse for his conduct, and suffered a neglectful childhood, the court applied five enhancement factors. The court placed great weight on Ms. Jenkins's injuries, noting that two bullets would remain lodged in her body for the remainder of her life, that she suffered constant pain, and that she walked with a cane since the shooting. The court likewise placed great weight on the Defendant's having no hesitation about committing a crime when the risk to human life was high. After weighing all of the factors, the court determined that the enhancement factors outweighed the single mitigating factor. The record supports the court's determinations. The Defendant attempted to shoot Mr. Holden and Mr. Love because of a previous dispute involving the robbery, fired multiple shots in broad daylight, and injured Ms. Jenkins, an unintended victim, who was mere feet from the Defendant when he fired the handgun.

Relative to the trial court's denial of alternative sentencing, probation is available to a defendant sentenced to ten years or less. *Id*. § 40-35-303(a) (2018). The Defendant received an eleven-year sentence for attempted second degree murder and was, therefore, ineligible to receive probation. Furthermore, the record supports the trial court's ordering the Defendant to serve this within-range sentence in confinement.

The record reflects that the trial court considered the appropriate principles in ordering the Defendant to serve his entire sentence in confinement. The court determined, based upon the Defendant's extensive history of juvenile adjudications and delinquent conduct, that the Defendant had failed to avail himself to the numerous opportunities for rehabilitation. The Defendant received the benefit of pretrial diversion for two counts of disorderly conduct and one count of aggravated assault involving either a bat or a knife in March 2011, but he continued to engage in delinquent conduct. The Defendant's juvenile adjudication history occurred between March 2011 and May 2016 and involved multiple offenses of violence, including an assault that occurred seventeen months before the shooting in this case. The Defendant admitted committing what would have been aggravated robbery and aggravated burglary if he had been adult. The Defendant admitted robbing a person at gunpoint and breaking into a home. The Defendant likewise admitted that less than two months before the present offenses he had shot one of his intended victims in the present case. The Defendant's history of delinquent conduct, along with the present offenses, reflects an escalating use of violence and deadly weapons and an extensive history of delinquent conduct. *See id*. § 40-35-103(1)(A). Likewise, the Defendant received the benefit of probation as a juvenile offender but violated the

conditions of his release twice and also failed to appear in connection with the delinquency petition for an assault with bodily injury. *See id.* § 40-35-103(1)(C).

Furthermore, the record supports the trial court's denial of alternative sentencing based upon the seriousness of the offenses. *See id*. § 40-35-103(1)(B). The Defendant fired a handgun multiple times around 3:00 p.m. in a public area because of a previous dispute between the Defendant and his intended victims. The Defendant was mere feet from Ms. Jenkins when he fired the handgun, showing no regard for her safety. Ms. Jenkins, an innocent bystander waiting for someone to pick her up, was shot and suffered serious and permanent injuries. The record supports the court's determinations that the Defendant's conduct was aggravated in that it endangered everyone in the area and that the Defendant had no hesitation about committing the offenses when the risk to human life was high. The record supports, as well, the court's determination that confinement was necessary to protect the public from the Defendant's further criminal behavior. As a result, the trial court did not abuse its discretion, and the Defendant is not entitled to relief on this basis.

Relative to consecutive service, the trial court determined that the Defendant was an offender whose record of criminal activity was extensive. *See id*. § 40-35-115(b)(2); *see also State v. LaQuinton Brown*, No. E2015-00899-CCA-R3-CD, 2016 WL 3633474, at *14 (Tenn. Crim. App. June 29, 2016) ("This court has repeatedly 'approved the consideration of a defendant's history of juvenile adjudications in determining whether a defendant has an extensive record of criminal activity for consecutive sentencing purposes.'") (quoting *State v. Carlos Campbell*, No. E2014-00697-CCA-R3-CD, 2015 WL 6155893, at *22 (Tenn. Crim. App. Oct. 15, 2015)), *perm. app. denied* (Tenn. Oct. 20 2016); *Lamario Sumner v. State*, No. W2009-00453-CCA-R3-PC, 2010 WL 4544955, at *8 (Tenn. Crim. App. Nov. 10, 2010). We have already concluded that the record supports this determination based upon the presentence report and the Defendant's testimony at the sentencing hearing. As a result, the trial court did not err by imposing consecutive service on this basis alone.

Additionally, the trial court imposed consecutive service because the Defendant was a dangerous offender whose behavior indicated little to no regard for human life and that he had no hesitation about committing a crime in which the risk to human life was high. *See* T.C.A. § 40-35-115(b)(4). The court, relying on the presentence report and the sentencing hearing evidence, found that the circumstances of the offenses were aggravated in that the Defendant fired a handgun multiple times in a public area during the afternoon daylight hours, endangering the intended victims along with innocent bystanders, including Ms. Jenkins. The Defendant was mere feet from Ms. Jenkins when he fired the handgun, and he admitted that although he did not intend to hurt Ms. Jenkins, his conduct nonetheless caused her permanent injuries. Likewise, the shooting was prompted by a feud between the Defendant and his intended victims, and the Defendant admitted shooting one of his

-11-

intended victims less than two months before the present offenses. The Defendant's history of criminal conduct shows a pattern of escalating violence. As a result, the record supports the court's determinations that consecutive service was reasonably related to the severity of the offenses and was necessary to protect the public from the Defendant's further criminal behavior. *See State v. Wilkerson*, 905 S.W.2d 993, 939 (Tenn. 1995); *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999). The trial court did not abuse its discretion by ordering consecutive service on this basis. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court. However, the record does not contain judgment forms for indictment Counts 1, 4, 5, and 6. *See State v. Berry*, 503 S.W.3d 360 (Tenn. 2015); Tenn. R. Crim. P. 32(e)(3). Therefore, we remand the case to the trial court for the entry of judgment forms reflecting that Counts 1, 4, 5, and 6 were dismissed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE